## STATE v. WELLS
### (No. 1017; Decided March 6, 1923; 212 Pac. 1099)

CRIMINAL LAW—GAMING—EVIDENCE OF OFFENSE OTHER THAN AS CHARGED—INSTRUCTIONS—CONVICTION OF OFFENSE OTHER THAN AS CHARGED.

1. In a prosecution for conducting a game of cards for representatives of value on a specified date, evidence of different games, on other occasions than as charged, should have been excluded.

2. In a prosecution upon a charge of conducting an unlawful game with cards, an instruction submitting the case, not on the offense charged in the information as identified by the prosecuting witness, but, on facts testified to by other witnesses concerning other games, was prejudicial error.

3. The effect of an instruction submitting a case on facts testified to by witnesses, concerning offenses, other than as charged in the information, or identified by the prosecuting witness, may be considered without an exception under a specification of error on appeal, that the verdict and judgment are contrary to law.

4. In a prosecution for conducting and carrying on a game of poker for money on a certain date, the testimony of a witness as to games played after such date was inadmissible.

APPEAL from District Court, Platte County; HON. W. C. MENTZER, Judge.

Fern Wells was convicted of conducting and carrying on a game of poker for representatives of value, and appeals. The material facts are stated in the opinion.

*Marion A. Kline* and *Oscar O. Natwick,* for appellant.

The prosecution was under Section 2856 C. S.; the section is in conflict with Article III, Section 24 of the Constitution and void; the law as originally enacted was a license statute, such being its purpose as expressed in its title; its amendment and conversion into a penal statute, extending its operations beyond the purpose expressed in the original title and not germane thereto, rendered it invalid. (Lewis Suth, Stat. Cons. 2nd Ed. 120, 137, 139; Ex Parte Cowert, (Ala.) 9 So. 225; Board v. Aspen M. & S. Co., (Colo.) 32 Pac. 717; Dolese et al. v. Pierce, (Ill.) 16 N. E. 218; State v. American Sugar Refining Co., (La.) 31 So. 186; State v. Cornell (Neb.) 74 N. W. 432; State v. Bowen, (Neb.) 74 N. W. 615; State v. Tibbetts, (Neb.) 71 N. W. 990; Armstrong v. Mayer, (Neb.) 83 N. W. 401; People v. Fleming, (Colo.) 3 Pac. 70; Mack v. State, (N. J.) 36 Atl. 1088; Astor v. Railway Co., (N. Y.) 20 N. E. 594; Kennedy v. Le Moyne, (Ill.) 58 N. E. 903.); the information fails to state a crime; poker is not enumerated as a game forbidden by the statute (State v. Walsh, 43 Minn. 444; 45 N. W. 721.); the information is too indefinite to support a judgment; it fails to allege whether defendant conducted the game as owner or for hire; it alleges that defendant conducted the game for representatives of value, without alleging that the representatives of value were the subject of gambling, or compensation for services (People v. Carroll, ·22 Pac. 129.); it fails to describe the valuable things (Anthony v. State, 23 Tenn. 83.); the court erred in permitting the admission of evidence relating to games at occasions other than as charged or described by the prosecuting witness (Fields v. Territory, 1 Wyo. 78.); the court erred in receiving evidence of offenses on dates subsequent to the date alleged in the information (Wickard v. State,

109 Ala. 45; 19 So. 491.); the verdict is contrary to
the evidence; several witnesses for the prosecution contra-
dicted the prosecuting witness as to the character of the
game conducted; the prosecuting witness Knight, being an
accomplice, required corroboration which was not supplied
(McNeally v. State, 5 Wyo. 59; 36 Pac. 824.)    The court
erred in submitting the cause on instruction number 5, said
instruction being based upon evidence erroneously admitted
(Konopisos v. State, 185 Pac. 355.)

*W. L. Walls,* Attorney General and *Vincent Carter,* Dep
uty Attorney General, for respondent.

Section 2856 under which the prosecution was brought, it
is true, was enacted as a gaming license act, but a reference
to its title shows that it was ''an act to restrict gaming,'' a
title sufficiently broad to support its amendment as a penal
statute. The statute is broad enough in terms to prohibit the
game known as poker.    The criticism of appellant as to the
form of the information is one which should have been made,
if at all, by motion to quash (6186 C. S.; Koppala v. State,
15 Wyo. 418.)    The information stated an offense and de-
fendant's motion for arrest of judgment was properly over-
ruled; there was sufficient evidence to sustain a conviction
independent of the testimony of the witness Daugherty,
hence the admission of his evidence was not prejudicial
(Thorndike v. Boston, 1 Met. 242-249; State v. Finney, 125
Ind. 427; Bothwell v. Milikon, 104 Ind. 162; Krug v. Davis,
101 Ind. 75; Anderson v. Cole, 26 Ind. 329; McDonald v.
Moore, 32 Ill. App. 142; Dunne v. Deery, 40 Ia. 251; Har-
man v. Kelly, 14 Ohio 502; Delameter v. Smith, 44 Pac. 266;
Sherburne v. Rodman, 51 Wis. 474; Kimball v. Hildreth,
90 Mass. 167.)    As to the sufficiency of the evidence, it
clearly shows that defendant participated in an unlawful
game and, in fact, shows that complaining witness bought
from defendant chips used in playing the game.    The game
as defined by the witness makes it a game of chance played

and conducted for representatives of value and it was, therefore, unlawful. The judgment should be sustained.

Potter, Chief Justice.

An information was filed in the District Court for Platte County on January 28, 1920, charging that the appellant "on the 15th day of September, A. D. 1919" in said county "did then and there unlawfully and maliciously conduct and carry on a certain game played with cards, known as poker, for representatives of value." There was endorsed on the back of the information the name of S. A. Knight as "Prosecuting Witness." Upon a plea of not guilty a jury trial was had on February 6, 1920, a verdict of "guilty as charged in the information" rendered, and thereafter the appellant was sentenced to pay a fine of $500 and the costs of the action, and to stand committed to the county jail until the payment of such fine and costs.

The information was filed under § 2856, Compiled Statutes 1910 (C. S. 1920, § 3389) which was originally Section 1 of Ch. 65 of Laws 1901, an act amending § 2178 of the Revised Statutes of 1899. The section as amended in 1901 and now contained in the Compiled Statutes reads as follows:

"Every person who shall deal, play, carry on, open or cause to be opened, or who shall conduct, either as owner or employe, whether for hire or not, any slot machine, game of faro, monte, roulette, lansquenette, rondo, vingt-un, commonly known as twenty-one, keno, props, or any other game played with cards, dice or other device of whatever nature, for money, checks, credit, or other representatives of value, shall be guilty of a misdemeanor, and on conviction thereof, shall be punished by a fine of not less than three hundred nor more than one thousand dollars, or by imprisonment of not less than three months nor more than one year, or by both."

The section thus amended had declared it a misdemeanor to do the acts mentioned "except under a license as herein-

after provided.'' The only changes made by the amendment were the omission of the words ''except under a license as hereinafter provided,'' inserting the words ''any slot machine'' where it now appears, and the words ''or any other game'' after the naming of certain games, instead of the words ''or any banking game,'' originally found at that place in the section.

A question is raised by the specifications of error and in appellant's brief as to the validity of the statute under Section 24 of Article III of the State Constitution, which we do not think necessary to determine. Nor do we think it necessary to consider the questions raised respecting the sufficiency of the information or whether or not it charges an offense punishable under the laws of this state. There was but one exception taken on the trial, and, since the case can be here disposed of upon other grounds, we should prefer to consider the above mentioned questions, if at all, in disposing of a case more closely tried than the case at bar appears to have been, and where such questions are shown to have been properly presented to the trial court.

The prosecuting witness above named was the first witness called upon the trial, and he fixed the date of the game charged to have been carried on and conducted as follows: ''Along about September, I would not say it was September, was near that time. * * *'' And later, during his examination by the prosecution, he said as to the date: ''Well, it was close to September, it may have been the latter part of August or the first part of September, I could not say.'' He then stated that he referred to the year 1919 and the place as George Lowry's soft drink parlor in Guernsey in said county. On cross-examination he stated that the alleged crime occurred on or about the 15th day of September, that being the date as near as he could remember. But during the cross-examination he also stated that it may have been the first of September or the latter part of August. He described the game as one in which he sat as one of the players with the defendant ''Fern Wells, Daugherty, Gus

Anderson, and Bennett, one or two more, I don't remember their names." He then testified as follows:

Q. Who was running the game? A. Why, I don't know, I suppose George Lowry was, Fern Wells had charge of it. Q. What was the position that Fern Wells occupied in the game? A. He took the rake-off. Q. What do you mean by taking the rake-off, Mr. Knight? A. Well, take out a chip every so often for the house. Q. Did Mr. Wells pay? A. No sir. Q. Who did you buy your chips from? A. We bought them from Fern—Lowry paid. Q. Fern who? A. Wells. * * * Q. Did you sit in a game on more than one occasion where Fern Wells was taking the rake-off? A. I am not sure that I did, no sir, I would not be sure that I sat in more than one game where Fern Wells was taking the rake-off. * * * Q. When you bought that stack of chips from Fern Wells, how much did you pay for them? A. I don't remember, I think it was $10, $5 or $10, I don't remember which."

That witness stated also two or three times during his examination that he never saw the defendant Wells doing anything while he was in Guernsey during the year 1919, probably meaning that he did not see him engaged in any occupation.

The next witness called was James Bennett, the person named by the witness Knight as one who played in the game described by him. He stated that he was acquainted with the defendant Wells and had seen him in Mr. Lowry's place; "doing about the same as everybody else, some times he was not doing anything, setting, talking and at other times playing freeze-out and solitaire." He was then asked by counsel for the prosecution if he remembered a game during the month of September in which he "Gus Anderson, Knight, Daugherty and Fern Wells" were playing. His answer was: "Yes sir, I think so, I don't think all of those boys were in the game." He was then further interrogated and testified as follows:

"Q. What was that game you were playing at that particular time, Mr. Bennett? A. Freeze-out. * * * Q. Was there anybody sitting in that game taking the rake-off? A. Not that I remember of. Q. How would you describe the game of freeze-out, Mr. Bennett? A. Each one takes so many chips, deal out the cards and draw, deal the hands around according to how many were playing, and whoever would have the best hand would beat and whoever lost his chips first had to pay for the chips. Q. How much was involved in these various games? A. That depends on how many were playing. Q. What was the price of the chips; what did you pay for them? A. Sell them? Q. Didn't you cash them in? A. No sir. Q. What did you do with them? A. We would get chips on the house then. Q. Those chips you got on the house, what would you do with them? A. Buy anything he had there. * * * Q. What would the man who lost have to pay for these chips, Mr. Bennett? A. Well, whatever the chips would be worth that he got. Sometimes 5 cents a piece and other times 10 cents a piece. Q. On this particular occasion do you remember when you played with Fern Wells and Chief Daugherty and Stanley Knight and Gus Anderson, what did you get for your chips that night, what were they worth? A. I do not remember whether I had any chips left or not, but they were 5 cents, most of the chips."

On cross examination he was asked more particularly with reference to the chips and testified as follows:

"Q. In describing these chips, that you state were five and ten cents apiece, have you reference to the stack of chips that you purchase on entering the game, or do you have reference to the chips that you get when someone was froze out? A. What we get when someone was froze out. Q. Then if four were playing this game it would cost the loser twenty cents, is that so? A. Yes sir. Q. These chips represented so much in trade? A. Yes sir. Q. You say Knight was in this game with you? A. I would not say positively that he was, but I think he was. Q. Did you

ever sit in a game with Knight where you took out a stack of chips at $5 and $10 and played poker? A. I don't think so. Q. Did you during the month of September, 1919? A. I don't remember of ever sitting in a game and taking out that many chips. * * * Q. The only game you remember of playing in which both Fern Wells, Lowry and Knight were playing is that game you just testified to? A. I don't remember who was in those games at all, they was coming and going all of the time. Q. Mr. Bennett, you heard the testimony of Mr. S. A. Knight in which he stated that you were sitting in a game with him and he took out a stack of chips which cost him $5 or $10—he did not remember which. Do you remember that game? A. I heard the statement but don't remember the game. Q. You do not remember sitting in a game of that kind with him? A. No, not that kind of a game. Q. I will ask you, Mr. Bennett, who had charge of the chips and who had charge of the game that you have just stated you took part in? A. They just generally helped themselves to chips, took out twenty or whatever they wanted to start with, and each one took the same amount. They was setting on the table. Q. As I understand you, a bunch of you fellows would come in to a place, seek out a table, take the chips there, each take a stack, sit down and have a game. A. Yes sir. Q. And no one has charge particularly? A. That is it. Q. Who was operating the place of business in which you were playing this game? A. Mr. Lowry, I suppose. Q. Then you do not remember of Mr. Wells having taken any further part in the game than the rest of you, do you? A. No sir. Q. One had as much to say about the game as the other? A. Yes sir.''

The next witness, G. A. Daugherty, testified that he may have seen Fern Wells in the town of Guernsey after the 16th of September, 1919; that it would have to be after the 16th of that month if he had seen him there that month at all; that he had seen him waiting on customers in Mr. Lowry's place at different times. The witness was then

asked the following questions: ''Q. Along after the 16th
of September, when you came back to Guernsey, Mr. Daugh-
erty, do you remember an occasion that you sat in a game, a
card game, with Jim Bennett, S. A. Knight, Gus Anderson
and Fern Wells? A. Well, I have played games in there
with them.'' An objection was interposed to what occurred
after September 15th. The objection was overruled and an
exception to the ruling noted. His testimony was continued
as follows, quoting a part only:

''Q. What games did you play in there, Mr. Daugherty?
A. Well, games they called freeze-out. Q. Will you de-
scribe to the jury just what freeze-out is? A. Well, it is
a game we call poker, but it is freeze-out, but played the
same as poker. Q. You play for chips? A. Yes sir. Q.
Which are worth money or credits? A. Well, they are
worth credits or money, either one, the way they played
they would cash them in. Q. What were these chips worth,
Mr. Daugherty? A. They were worth their full value in
trade. * * * Q. You played there several times in
these freeze-out games? A. Yes sir. Q. On these various
occasions, did you see Fern Wells working in there? A.
At times he was in there. Q. In charge of the business, was
he? A. Well, in a way he was, and in a way he was not,
that is, he seemed to be working there. Q. Who was in
charge of the games? A. Well, nobody in particular. Q.
Who did you get your chips from? A. What do you mean,
the chips we played with? Q. Yes. A. Just took them,
they were there. Q. Who redeemed the chips? A. There
wasn't any redemption to it. Q. Who paid you in mer-
chandise? A. Lowry or Wells. * * * Q. Explain
how these freeze-out games are conducted from the minute
you start in, how you play, how many chips you take, and
where you get them? * * * A. Each man takes 20
chips and play until one man has lost all of his chips and
the game is over. * * * Q. What does that man pay
then that loses? A. Well, it costs whatever they are play-
ing for. Q. Who does he pay then? A. He pays the pro-

prietor. Q. The proprietor in this case was either Fern Wells or George Lowry? A. Not all of the time, there is another old fellow, I do not know his name, who was in there. * * * Cross Examination. Q. Mr. Daugherty, the game of freeze-out as played as you have described and some men got chips and traded in for value for merchandise, and the house would not be the gainer except the merchandise? A. That is the way I understand it. * * * Q. I believe you said also that no one in particular had charge of the game and upon which all of you would come into the room, sit down and each assume management of the game, take out a stack of twenty, and only when a man went broke he paid twenty cents and each one got a five cent chip back? A. Yes sir. * * * Redirect Examination. Q. Now, Mr. Daugherty, you say that the house did not profit by this game? A. Well, not any more than selling the merchandise. Q. But if there were four of you at a table playing freeze-out, each would take twenty chips? A. Yes sir. Q. And the man who lost all of his chips first would be the person who was frozen out? A. Yes sir. Q. What would he pay? A. Whatever they were playing for. Q. Suppose they were playing for ten cent chips? A. He would pay forty cents. Q. He would lose then forty cents to the other men? A. Well, he would lose it to all of them. Q. In other words, if there were four playing, and they were playing for ten cent chips, then the game would cost the loser 40 cents? A. Yes sir. Q. And each player got a ten cent chip? A. Yes sir. * * * Q. And the house, whether it was Lowry or Wells, sold you these chips for the money, for the 40 cents, if they were ten cent chips? A. He did not sell them to you; we would take the chips. Q. Whenever a man lost a game—a good deal like the game of pocket pool, whenever the men would lose the game the house would come and distribute around four chips and collect 40 cents for it? A. Yes sir. Q. And collect 40 cents from the loser? A. If playing for that amount. Q. And the house encouraged that game didn't it, and authorized it

to be played there? A. That was up to you, I reckon, whether you wanted to play or not. Q. Anybody who wanted to play that game there could play it? A. I suppose. Q. And the house would serve, whoever was in charge, would serve the four chips when the game was over? A. Yes sir.''

The next and last witness for the prosecution was Gus Anderson, one of the persons named by the prosecuting witness as having been in the game about which he testified. Anderson testified that he had played freeze-out in Lowry's place, the same as poker except that the game is out when one player has lost his chips; that he had played there frequently, but could not remember the month or months when he played; that he did not see Fern Wells in charge of the place or working around there; that he may have sat in a game with Daugherty, Bennett, and Knight, such a game as described by the witness Daugherty; that no one had charge of the game; that after the game was over, they got tin merchandise chips from Lowry, paid for by the loser of the game; that he never saw Fern Wells give out any of the chips; that he could not remember having played a game there in which they paid for stacks of chips as testified to by Knight.

George Lowry was the sole witness for the defense. He testified that the merchandise chips paid for by the loser of a freeze-out game were sometimes given out by him and sometimes by Fern Wells or someone else working for him; that the only duty in that particular is ''to give out the chips and take them back if someone wants anything.'' He was asked this question: ''Is the practice pursued and the custom followed as Mr. Daugherty described, that is to say, a bunch of men come into the place and take out chips for themselves, and no one has charge of the game, but they continue to play until someone goes broke; is that the way the game is conducted?'' His answer was: ''That is the way.'' He further testified that Knight's testimony to the effect that he, Lowry, Wells, and others were engaged in a

poker game wherein five and ten dollar stacks of chips were sold was not true. On cross examination he testified that the defendant Wells was authorized to look after the freeze-out games and distribute the tin or metal chips to the players at the end of the game, and that he did that, collecting from the loser the money represented by said chips.

The court gave the jury an instruction to the affect that if they should find from the evidence beyond a reasonable doubt that the defendant carried on or conducted a game with cards, called poker, resulting in the loss by the loser of money, chips, or other thing of value, distributed among the other participants of the game, then such game was gambling, and concluding with these words: ''and if the defendant, either as the agent of George Lowry or on his own behalf, distributed said chips and things of value to the participants in said game, and collected money for the same from the loser of said game, he conducted and carried on a gambling game within the meaning of the law, and it would be your duty to find him guilty as charged.''

We have quoted at some length from the testimony in the case for the purpose of showing the condition of the evidence upon which the case was submitted to the jury under the said instruction. That was the only instruction referring particularly to the offense for which the defendant was tried; the other instructions covered general principles only, which might properly be given upon the trial of any criminal case. The testimony of the witness Knight, who was named upon the information as the prosecuting witness and the first witness called by the prosecution, must be understood as having fixed and identified the occasion and the game alleged in the information to have been conducted by the defendant. (Fields v. Territory, 1 Wyo. 78.) Indeed, no other particular game was identified by either of the other witnesses except Bennett, and he did not fix the time otherwise than by answering a question inquiring if he remembered a game during the month of September in which certain stated persons were playing. While he gave an af-

firmative answer to that question, he modified it by stating that he did not think all of those "boys" were in the game, and on cross examination he stated that he did not remember who were in the games he played, "they were coming and going all of the time." With that exception the testimony of the other witnesses referred to games, including several or many, in which the witnesses had played with others, but without fixing the time or occasion of any particular game. And it is clear from such testimony, as well as the denial of each of said witnesses that they had played in the game described by the witness Knight, that their testimony cannot be understood as identifying or referring to the occasion or the game testified to by Knight. We do not think that the testimony of Bennett, Daugherty or Anderson is to be understood as merely giving a different description of the game mentioned in Knight's testimony, for they denied having been engaged in playing such a game.

.In our early case above cited it was held that upon a trial under an indictment so drawn that it might cover several different offenses of the same nature, the prosecution, after examining the first witness naming one offense on a day certain, must confine its proof to that particular offense. The prosecution in that case was for permitting a certain game of chance to be played for money in a house under the defendant's control. The court said: "That which constitutes the misdemeanor　*　*　*　is not the keeping of a gaming house, but the keeping, the dealing, or permitting to be kept or dealt, any game of chance with cards for money, etc., in any building or place under one's control, which game is not authorized to be licensed by the statute. The doing or permitting either of the acts prohibited in itself constitutes an offense and as often as one does or permits either of the acts to be done, he commits a distinct misdemeanor *　*　*. Evidence can only be offered tending to prove one distinct offense, and when such an offense has been fixed as to time and place, the proof should be confined to it alone. *　*　* In this case, the prosecution, by the witness Kep-

linger, fixed a time when the alleged misdemeanor as charged in the indictment was committed, and all evidence not tending to prove this alleged misdemeanor, on objection of defendant, should have been ruled out by the District Court.''

The instruction in the case at bar above referred to and quoted from did not, we think, submit the case to the jury for conviction or acquittal upon the charge contained in the information, as identified by the prosecuting witness, but submitted the question of defendant's guilt upon the facts testified to by the other witnesses concerning other games; and the court seems to have ignored in that instruction the game testified to by Knight. No exception was taken to the instruction so far as the record discloses, but we think that its effect in submitting the case as above stated may be properly considered without an exception, under the specifications of error that the verdict and the judgment are contrary to law. The latter part of the instruction could have had reference to and been based only on the testimony of such other witnesses, and the first part seems to have been intended also to refer to that part of the evidence, since it mentions money, chips, or other thing of value, ''distributed among the other participants of the game.'' The game testified about by the prosecuting witness was one in which a stack of chips was bought by each player, and in which the defendant would ''take out a chip every so often for the house,'' which the witness called a ''rake-off.'' We are of the opinion, therefore, that the verdict, construed in connection with said instruction, must be understood as having convicted the defendant, not of the particular offense charged in the information, but of having conducted some other game testified to and described by one or more of the other witnesses above mentioned. As above indicated, no instruction was given referring particularly to the game identified and described by the prosecuting witness.

We think also that the court's ruling upon the objection to the testimony of the witness Daugherty, as to what occurred after the 15th of September, 1919, was error, since

the question objected to could not have referred to the occasion or game testified about by the prosecuting witness, and that part of his testimony describing games that were played when he was present does not appear to have referred in any way to the game or occasion mentioned by said prosecuting witness; nor does it appear to have been otherwise relevant.

For the reason that the defendant appears to have been convicted of an offense different from that charged, and also for the error in admitting the testimony aforesaid of the witness Daugherty, the judgment will be reversed and the cause remanded for a new trial.

*Reversed and Remanded.*

BLUME and KIMBALL, JJ., concur.